```
            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF OHIO
                  WESTERN DIVISION
```

Tangela Baugus,                :    Case No. 1:09-cv-242
                               :
    Plaintiff,                 :
                               :
vs.                            :
                               :
AK Steel Corporation,          :
                               :
    Defendant.                 :

**ORDER**

Before the Court is Defendant's motion for summary judgment. (Doc. 30) Plaintiff opposes the motion (Doc. 31), and Defendant has filed a reply. (Doc. 32) For the following reasons, the Court will grant Defendant's motion.

**FACTUAL BACKGROUND**

Plaintiff Tangela Baugus was hired by Defendant AK Steel in August 2006. She was hired as a temporary replacement worker at a time when AK Steel had locked out its union employees at its Middletown plant. That lockout ended in March 2007, after which AK Steel released most of the replacement workers it had hired. Baugus successfully applied for regular employment with the company, and on July 1, 2007 she was hired as a utility technician. She remains employed with AK Steel.

Sometime after the union employees returned to work, Baugus

-1-

began to hear comments about "scabs" and "scab workers" (a term apparently used to describe the temporary workers who worked for the company during the lockout). Baugus testified that none of the comments were specifically directed at her, but she overheard some of them. In September of 2007, AK Steel asked Baugus to help retrain a returning union employee, Tom Terry, who needed retraining to return to an operator position. Baugus did the initial retraining, after which Terry went through a second retraining session in December 2007. Terry did not perform well, and he was disqualified from the position by Al Pierce, an AK Steel supervisor for the line on which Baugus worked. Baugus believes that because she helped to retrain Terry, other union employees held her responsible for the fact that Terry was ultimately disqualified.

Sometime after the incident with Terry, Baugus claims that graffiti began appearing in the men's bathroom. A male co-worker first mentioned it to her, telling her that he tried to cover it up or scratch it out. Other male co-workers told her they had seen writing on the bathroom walls, phrases such as "scabs suck" and "scabs R us." At first, Baugus thought that the graffiti was due to angry union employees. Eventually she learned that her name had been scratched on the wall, at least once and perhaps twice, attached to derogatory references. It is unclear when she learned of these latter comments, but she testified that she did

not actually see any of the graffiti until May 2008, when a male friend took photographs of the bathroom wall graffiti. The only graffiti she personally observed was after someone wrote "scab pot" on the coffeepot she used at her line work station.

Baugus admitted that she did not report any of these incidents to AK Steel's Ethics Hotline, to Human Resources, or to Labor Relations. Baugus also admitted that she was aware of AK Steel's zero-tolerance policy concerning harassment, and that the policy requires any employee to immediately report harassment to one of those departments. Baugus did not file a grievance with the union, although she strongly suspected that union members were responsible for the graffiti.

Baugus and Phil Yaple, her co-worker and friend, told Al Pierce about the graffiti in May 2008 when Yaple took the photographs to Pierce. Baugus did not know if Pierce had been told about the graffiti before that time. After he was informed of Baugus' complaints, Pierce told Baugus that he would take care of the situation, and suggested she try to avoid any situations or contact with anyone she felt might be responsible. (Baugus Deposition at pp. 69-70) Pierce then informed Jessica Morris, AK Steel's labor relations representative, about the situation. Morris instructed Pierce to have the bathroom repainted, and to warn all employees that such behavior was prohibited. Morris also asked Pierce to have shift supervisors check the restrooms

once a day during each shift.  Baugus admitted that she was aware of these steps, but said she did not know whether the shift supervisors actually checked the restrooms each shift.  Baugus alleges that she was told that Morris and Pierce would have a meeting with her and Yaple about the graffiti, but that no one from Human Resources or Labor Relations ever interviewed her.  Since that time, however, Baugus has not learned about any other graffiti or witnessed other harassing comments or conduct directed at her.  She testified that she was recently told by a co-worker that some graffiti about "AK scabs" had appeared on the men's bathroom wall.

Baugus admitted that she has never been grabbed or touched inappropriately at work, that no one ever made sexual advances towards her, and that no AK Steel supervisor or manager ever said or did anything to her that she thought was sexually inappropriate.

Baugus filed a charge with the EEOC on June 4, 2008, alleging sexual harassment, hostile work environment and reverse race discrimination.  The latter claim was based upon a position at AK Steel that was filled by an African-American woman.  After she received a right to sue letter, she timely filed her complaint in this Court on April 7, 2009.  She alleges that she has been subjected to degrading and harassing verbal assaults, and a pervasive hostile work environment. She alleges that male

employees deliberately refused to allow her to schedule rest room breaks during her shift, causing her physical discomfort and kidney infections. Despite AK Steel's actual knowledge of the pervasive sexual harassment, she complains that it took no corrective action and did not investigate the graffiti. She also alleges that she was the victim of sexual favoritism and reverse race discrimination, after a less qualified African American female was hired for a TQS coordinator position.

The Court previously dismissed Baugus' sex discrimination claim based upon another woman's promotion to the TQS position. (Doc. 8) Defendant now seeks summary judgment on Baugus' remaining claims alleged in Counts Two and Three of her complaint, hostile work environment and reverse race discrimination.

## ANALYSIS

Summary Judgment Standards

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but

... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether,

in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

Hostile Work Environment

Baugus' hostile work environment claim is largely premised on the graffiti incidents in the men's bathroom, and the one incident when "scab pot" was written on the coffeepot at her work station. It is well established that a hostile workplace claim must be supported with evidence of gender-based animus, and that "Title VII does not prohibit all verbal or physical harassment in the workplace." Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 80 (1998). The majority of the ten or so incidents of which Baugus complains involve the term "scab" or "scabs," which

-7-

is not obviously gender-specific.  As AK Steel argues, the lockout at its plant was lengthy, and when union employees returned to work in the spring of 2007, there were over 700 replacement workers working at the plant.  Baugus has no evidence that most of the graffiti was directed at her, or even at all of the female replacement workers.  This conclusion is bolstered by the fact that the graffiti appeared in the men's bathroom, not in the women's bathroom.

But generously assuming that at least some of these incidents were based on gender hostility and not her status as a replacement worker, Baugus has not established the type of severe or pervasive harassment that is sufficient to support her claim.  The Supreme Court has held that actionable harassment must be so severe or pervasive that it alters the conditions of the workplace.  Faragher v. City of Boca Raton, 524 U.S. 755, 788 (1998).  "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).  Cases applying these standards make it clear that Plaintiff's claim lacks merit.

In Morris v. Oldham County Fiscal Court, 201 F.3d 784 (6th

Cir. 2000), the court found that a supervisor's several dirty jokes told in front of plaintiff, his sexual advance that the court labeled "truly offensive," his reference to plaintiff as "Hot Lips," and his isolated comments about plaintiff's dress, were insufficient to support a sexual harassment claim. In Black v. Zaring Homes, 104 F.3d 822 (6th Cir. 1997), the Sixth Circuit reversed a jury verdict in favor of plaintiff, finding that the conduct she complained of was insufficient to support her harassment claim. Plaintiff had been subjected to various sexually suggestive and discriminatory comments at regular weekly meetings over a four month period. The comments, while certainly offensive, were insufficient to support the verdict under the totality of the circumstances.

And in Ladd v. Grand Trunk Western R.R., 552 F.3d 495, 501 (6th Cir. 2009), plaintiff alleged that "... she heard words 'lesbian,' 'dyke,' and 'gay' thrown around generally by co-workers, other general sexual remarks, and comments that she could not and should not be working because she is a woman, as well as the allegations that co-workers tampered with her equipment, and that Richert referred to her as a 'black bitch.'" Noting that plaintiff failed to adequately specify the extent of the verbal abuse she claims to have suffered on a daily basis, the Sixth Circuit found that the totality of her allegations failed to support a sexual harassment claim.

Here, Baugus complains about ten incidents of graffiti, only one of which was specifically directed at her and found in her work vicinity, and which apparently occurred over a period of approximately six months.  None of the comments can be construed as physically threatening, and there is no evidence that Baugus was unable to perform her job duties during this period of time.

Moreover, in cases involving harassment by co-workers, "an employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."  Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999)(internal quotations omitted).  Baugus does not allege, and there are no facts suggesting that harassment was committed by a supervisor or manager.  Baugus admits that she was aware of AK Steel's policy prohibiting sexual harassment, and admits that she did not complain about any incidents or the graffiti until she spoke to Al Pierce.  Baugus fails to identify any facts suggesting that AK Steel knew about any of the incidents before that time.

Baugus also admits that after she did complain to Pierce, AK Steel took corrective action by painting the men's room walls, and instituting a regular check by shift supervisors.  She complains that this response was not sufficient, because AK Steel did not fully investigate to find out who was actually responsible for the graffiti in the men's room or on the

-10-

coffeepot. Jessica Morris states in her declaration that after Pierce reported the problem to her, she instructed Pierce to have the walls painted, to warn all employees about such conduct, and to regularly monitor the restroom. Pierce did not know who had actually written the graffiti, and Morris states that there was no practical way to discover the responsible person, as there are no cameras in the restroom and Union members are generally loyal to each other. (Doc. 30, Exhibit 1 at ¶10.) Baugus does not challenge any of these statements, but simply complains that AK Steel "should have done more." She admitted that the graffiti disappeared, and that there were no further incidents that were directed at her after her complaints were addressed. Her dissatisfaction with the extent of the investigation, or AK Steel's failure to punish those responsible for the graffiti, does not support a conclusion that AK Steel failed to respond to her complaints.

In her opposition memorandum, Baugus also contends that she was harassed by some of her male co-workers who would not relieve her for bathroom breaks. (Doc. 31 at p. 3) In her deposition, Baugus admitted that no one at AK Steel ever denied her a break to use the restroom, and that if she needed to use the restroom she called her co-worker and told him she was going. She complained that the co-worker (John Conrad) did not affirmatively ask her if she needed a break, and felt that he should have done

that. (Baugus Deposition at pp. 138-141, 162) Wayne Johns, a supervisor on Baugus' line, testified that if Baugus wanted a break, "all she had to do was ask." (Johns Deposition at p. 10) The written lunch and restroom break schedule (Johns Deposition Exhibit 1) also states that restroom breaks, "if needed," would follow the relief schedule established for lunch breaks. Baugus' complaint that her co-workers failed to ask her if she needed a break does not amount to sexual harassment, much less constitute a hostile work environment.

After considering all of the evidence in the record, the Court concludes that Baugus has not established a genuine factual dispute concerning her claim that she was subjected to actionable sexual harassment. AK Steel is entitled to summary judgment on this claim.

<u>Reverse Race Discrimination</u>

Baugus alleges that AK Steel hired a less qualified African American to fill a TQS Coordinator position, subjecting her to reverse race discrimination. She argues that no Caucasian employee, including Baugus, was given the opportunity to be considered for that position. She contends that she has established a prima facie case under the <u>McDonnell-Douglas</u> burden-shifting framework, as modified for a reverse discrimination allegation. To do so, Baugus must establish that the circumstances surrounding the hiring of a minority candidate

support the suspicion that AK Steel is "that unusual employer who discriminates against the majority". Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003). She must also establish that she was qualified for the position, that she was not chosen for the position (or suffered some adverse employment action), and that she was treated differently than other similarly situated employees. Baugus' evidence falls far short of satisfying this burden.

Baugus testified that an AK Steel contractor named Don Hurley asked her at some point about her prior experience working in an office. Hurley told her that there was a job opportunity coming up, and that Baugus had been mentioned as someone who might be given an opportunity to try out for that job. Based on this conversation with Hurley, Baugus was under the impression that she would be seriously considered for this position, but she alleges that did not happen. Baugus testified that Don Hurley recommended the African-American candidate, and that AK Steel had no African-American women in its management department. (Baugus Deposition at pp. 99-106)

Baugus does not know what the duties of the job in question, a TQS Coordinator, actually are other than to "write the Q-tops." She did not know what qualifications were required for the job, and admitted that her previous office experience was limited to occasionally helping her brother with his trucking business.

Baugus has produced no evidence establishing what the requirements of the TQS Coordinator position are and on what basis she might have been qualified to perform those requirements.  Don Hurley, a Caucasian male, has submitted an affidavit stating that he was not employed by AK Steel during the time period in question, but worked for a contractor.  He had no authority to hire or select any candidate for any position at AK Steel.  He recommended the minority candidate for the TQS Coordinator position based on his personal observations of her work.  (Doc. 30, Exhibit 2)  Baugus proffers no other evidence that suggests that AK Steel is that "unusual employer who discriminates against the majority."  She has presented no statistics about AK Steel's hiring practices, no evidence regarding any other employment decision made by AK Steel that might suggest racial discrimination, and has not established who actually decided to hire the TQS Coordinator and what factors were used to arrive at that decision.  Her reliance on the fact that a minority candidate was chosen is insufficient, and her evidence falls short of establishing a prima facie case of reverse racial discrimination.  AK Steel is entitled to summary judgment on this claim.

## CONCLUSION

For all of the foregoing reasons, the Court concludes that AK Steel's motion for summary judgment (Doc. 30) should be

granted in its entirety.  Plaintiff's claims against AK Steel are hereby dismissed with prejudice.

    SO ORDERED.

    THIS CASE IS CLOSED.

DATED: August 25, 2010       <u>s/Sandra S. Beckwith</u>
                                   Sandra S. Beckwith
                                   Senior United States District Judge